# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA
## Alexandria Division

IKE NYIMPHA, JR.,  )
    Plaintiff,  )
              )
    v.  )    Civil No. 1:19-cv-258
              )
WILBUR ROSS,  )
    Secretary of Commerce  )
    **Defendant.**  )

## MEMORANDUM OPINION

Plaintiff, a former employee of the United States Patent and Trademark Office ("USPTO"), filed this suit by counsel pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act of 1967 ("ADEA"). Specifically, plaintiff has alleged that he was subjected to a hostile work environment and terminated because of his race and age.[1]

At issue in this matter is defendant's Motion for Summary Judgment. For the reasons that follow, plaintiff has failed to identify triable issues of fact as to his race- and age-based hostile work environment and discriminatory termination claims. Accordingly, summary judgment must be entered in favor of defendant on all of plaintiff's claims.

### I.

Summary judgment is appropriate only when there is "no genuine issue as to any material

---

[1] Plaintiff's Complaint also included a claim under the Virginia Human Rights Act ("VHRA"), which defendant moved to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), Fed. R. Civ. P. *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."). Plaintiff subsequently conceded this claim. Accordingly, defendant's motion to dismiss pursuant to Rule 12(b)(1), Fed. R. Civ. P., is no longer at issue.

1

fact" and based on those undisputed facts the moving party "is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Rule 56, Fed. R. Civ. P. Local Civil Rule 56(B) requires the movant to include in his brief in support of a motion for summary judgment a specifically captioned section listing all material facts as to which the moving party contends there is no genuine issue and citing the parts of the record relied on to support the listed undisputed facts. Local Civ. R. 56(B). The nonmovant must respond to each enumerated fact and either admit or contest by citing to record evidence. *Id.* Here, defendant, the movant, complied with this Rule, but plaintiff failed to do so.[2] Accordingly, the facts below are drawn from defendant's memorandum in support of the motion for summary judgment and are deemed admitted pursuant to Local Civil Rule 56(B).

- Plaintiff, an African American male born in 1967, began working at the USPTO on November 4, 2013 as a GS-9 Patent Examiner subject to a one-year probationary period.

- Plaintiff's duties as a probationary Patent Examiner consisted of examining patent applications to determine whether they met statutory and regulatory requirements. Examination involves selecting a patent application to review, reading the application, performing a search for prior art, finding references that would render the claimed invention not novel or obvious, and writing an office action that describes the USPTO's official opinion on patentability for that application and claimed invention.

- Supervisory Patent Examiner ("SPE") Jacob Betit participated in the assignment of probationary Patent Examiners in plaintiff's entering class into various Art Units. Plaintiff was placed into an Art Unit dedicated to database patent applications, AU 2158. Betit served as the first-line supervisor for examiners in AU 2158.

---

[2] Plaintiff's brief in opposition argued that summary judgment was not appropriate based on the Complaint's allegations and the unsworn testimony of a former coworker, Katrelle Jones-Bouie. Plaintiff also filed an affidavit pursuant to Rule 56(d), Fed. R. Civ. P., stating that plaintiff needed additional time to depose Jones-Bouie and James Heffern, another former coworker.

On September 27, 2019, plaintiff's request for additional time to conduct discovery was granted. Specifically, plaintiff was given until November 12, 2019 to file a supplemental brief in opposition that responded to defendant's statement of undisputed facts in accordance with Local Civil Rule 56(B), and defendant was given until November 19, 2019 to file a supplemental reply brief. After plaintiff failed to file a supplemental brief in opposition by November 12, 2019, defendant filed a notice on November 18, 2019 stating that plaintiff had failed to conduct further discovery and that defendant rested on the briefing in support of the summary judgment motion.

2

- Another probationary Patent Examiner in plaintiff's class, James Heffern, was also assigned to AU 2158. In placing probationary Patent Examiners into AU 2158, Betit looked for candidates he thought would perform well in AU 2158 based on their experiences.

- Upon commencing his employment, plaintiff entered the USPTO's Patent Training Academy (the "Academy"), a four-month training program completed by all new Patent Examiners. The Academy consists of classroom lectures and lab exercises and does not include significant work on actual patent applications.

- After completing the Academy, examiners move to their assigned Technology Center to examine patent applications based on their area of expertise. While in the Academy, plaintiff was part of a group of eleven probationary Patent Examiners, known as a "Lab," who received training from SPE Daniel Pan.

- During plaintiff's training at the Academy, plaintiff began working on patent applications. Pan provided general guidance to plaintiff, but Betit ultimately reviewed plaintiff's work. When plaintiff submitted his work for credit, Betit or another SPE would review his proposed office action and either approve the office action or return it to plaintiff for revision based on the reviewer's comments.

- Over the course of the probationary period, probationary patent examiners such as plaintiff are expected to improve over time and demonstrate an ability to work independently when the probationary period ends. Accordingly, although it is not unusual for an SPE to return an office action to an examiner for revision, the rate of returned office actions should decrease over time.

- An SPE approves an office action once it is error free and ready to be mailed to the applicant. Once an SPE approves an office action, that SPE bears responsibility for the approved office action.

- During the first several months of plaintiff's employment, plaintiff struggled to prepare office actions, and Betit returned plaintiff's office actions several times for revisions.

- From the beginning of plaintiff's employment, Betit did not see improvement in plaintiff's work quality. Betit would "spend a lot of time explaining what was going on in [plaintiff's] applications because [plaintiff] just didn't understand them." Betit observed that plaintiff struggled with his applications and did not incorporate feedback.

- Betit spent more time with plaintiff than with other junior Patent Examiners to try to help plaintiff understand his applications. Betit frequently returned plaintiff's work because plaintiff applied incorrect prior art and failed to respond to comments to correct issues in cases. Because plaintiff's work was of poor quality, plaintiff's production rate was low, meaning that plaintiff did not receive credit for much of his work.

- While Betit was on leave in February 2014, plaintiff reported to SPE Usmaan Saeed. Saeed reviewed plaintiff's office actions and observed that plaintiff "often would either not

3

understand [Saeed's] emails, or [plaintiff] would not follow the instructions [Saeed] had given [plaintiff]." Saeed felt that plaintiff had a hard time "understanding the applications based on the technology," had difficulty grasping Saeed's feedback, and that plaintiff did not use Saeed's search strategies. Saeed did not think that plaintiff's work "was at a level where I would accept it and send it out to an applicant."

- Plaintiff did not think Betit was providing him adequate assistance with his work and disagreed with Betit's assessment of his office actions. Specifically, plaintiff thought that Betit should have provided search terms to identify prior art instead of requiring plaintiff to develop search terms himself. Plaintiff suggested that Betit should have commented on plaintiff's applications electronically rather than writing his suggestions on paper and discussing them with plaintiff directly. And plaintiff believed that Betit should have consulted with other SPEs regarding plaintiff's office actions.

- Plaintiff acknowledged that the procedure for review of office actions was within Betit's discretion and that Betit met with plaintiff multiple times to discuss revisions of plaintiff's proposed office actions.

- Betit asked Jay Morrison, a Primary Patent Examiner permitted to sign office actions without SPE review, to help plaintiff with an application. On April 5, 2014, an email from Morrison to Betit regarding Morrison's conversations with plaintiff stated that plaintiff was still having difficulty searching for prior art and that plaintiff "needs to speed up and improve his searches to be successful."

- Plaintiff does not believe that Morrison acted in a discriminatory or harassing manner.

- Betit discussed plaintiff's performance with plaintiff's second line supervisor, Technology Center Director Wendy Garber. On April 16, 2014, Garber met with plaintiff and Betit to offer additional support to plaintiff. Plaintiff stated during the meeting that plaintiff met with Betit at least every two or three days and did not mention that he believed he was being harassed by Betit. Garber encouraged plaintiff to focus on understanding the specifications in his patent applications so that he would understand the inventions before performing prior art searches.

- On April 21, 2014, plaintiff sent Garber an email requesting assistance with one of his cases. Plaintiff's email stated that Betit had previously said to plaintiff in front of other examiners "I told you don't talk to nobody and I mean it!"

- During that incident, plaintiff told Betit he was speaking on the phone with "a friend" about one of plaintiff's assigned applications. Betit told plaintiff that plaintiff could not discuss applications with anyone outside of the USPTO. After the incident, plaintiff sent Betit an email stating, "I was not clear in my explanation. I was actually speaking with an [Information Technology Resource Provider] . . . to get direction on my search strategy." Betit responded, "OK. Remember you are not to talk to your friend about your cases. You may talk to the ITRP about how to perform your searches."

4

- On April 21, 2014, Garber forwarded plaintiff's April 21, 2014 email to Betit, and Betit explained to Garber that plaintiff was not following guidance on searching for prior art. On April 23, 2014, Garber encouraged plaintiff to continue working with Morrison on the application and to obtain guidance from Betit.

- On May 8, 2014, plaintiff contacted Garber again, complaining that Betit's piecemeal review of plaintiff's cases was inefficient and unfair.

- On May 12, 2014, Garber met with plaintiff and arranged for plaintiff to work in another art unit in a different technology area on a part-time, trial basis. Garber thought that plaintiff's work in another technology area would give plaintiff the opportunity to show that he could succeed under a different supervisor and in a different technology area.

- On May 20, 2014, Garber informed plaintiff that he could begin reviewing network patent applications and report them to SPE Jeffrey Nickerson in AU 2459. Nickerson docketed five network patent applications for plaintiff to examine. During the trial period, plaintiff would also continue posting database cases to Betit. The trial period would determine whether plaintiff would be permanently transferred to AU 2459.

- Nickerson reviewed plaintiff's office actions, returned the office actions to plaintiff with comments for revisions, and frequently met with plaintiff to discuss his work.

- Plaintiff did not think that Nickerson inadequately reviewed his cases and thought that Nickerson provided him with adequate assistance. Nor did plaintiff believe that Nickerson created a hostile work environment or engaged in discrimination against him.

- Nickerson thought plaintiff needed more supervision than other probationary Patent Examiners and that plaintiff's submitted work needed significant changes in order to be approved. Nickerson did not think plaintiff was improving in understanding the technology, searching for prior art, or writing rejections.

- On May 21, 2014, in his notes on a conversation with plaintiff, Nickerson observed that plaintiff struggled to describe several core concepts within an independent claim.

- Plaintiff also struggled to explain to Nickerson why certain prior art could be used to reject a claim.

- Plaintiff struggled to explain networking concepts and the inventions in the applications he reviewed. On multiple occasions, plaintiff demonstrated to Nickerson that plaintiff had not read the application he was examining.

- More than a month after plaintiff's trial period began, plaintiff had only successfully completed one networking application, and he had three networking cases returned at least once.

5

- In July 2014, Nickerson informed Technology Center Director Nancy Le that Nickerson did not recommend plaintiff for a transfer based on plaintiff's trial period performance. Nickerson also shared his assessment of plaintiff's work with Betit and Garber.

- Betit incorporated Nickerson's feedback into an 8-month evaluation given to plaintiff on August 4, 2014. At the time of plaintiff's 8-month evaluation, plaintiff's evaluations indicated that he needed improvement in most of the activities for which he was evaluated.

- At the time of his 8-month evaluation, plaintiff's production rate was 23 percent, Probationary Patent Examiners are expected to show potential to perform at a 95 percent production rate, the rate required for an employee to be considered fully successful.

- On July 28, 2014, Garber met with plaintiff and Betit to set production goals for plaintiff. Garber informed plaintiff that he would need to meet certain goals of cases approved and counted to be retained as a Patent Examiner. Specifically, plaintiff would need to complete two new cases in his 23rd pay period, two new cases in his 24th pay period, three new cases in his 25th pay period, and two to three cases in each subsequent pay period.

- Plaintiff failed to meet the first goal set for him, namely obtaining approval for two new cases in pay period 23.

- Plaintiff also failed to obtain approval for two new cases in pay period 24. By the afternoon of the last day of pay period 24, plaintiff had submitted only one new office action.

- On August 25, 2014, Garber notified plaintiff that his employment would be terminated effective that day. Garber alone made the decision to terminate plaintiff's employment.

- Garber provided plaintiff with a Notification of Termination During Probationary Period, which stated that:

Based on your nine (9) months with the USPTO, your performance has not progressed at the rate expected of a new patent examiner. Your progress has been slow and showing no improvement after consultations with your supervisor. Your progression has been slow despite having been given the opportunity to work with a second supervisor, upon your request. Further, you have not demonstrated that you can efficiently perform your assigned functions, to include planning a field of search, conducting searches, making proper rejections under § 35 U.S.C. 102(a)(b) and 103 with supporting rationale. In addition, you have not demonstrated the ability to understand the technology and compose proper rejections, ability to use USPTO search tools or learn new databases, and ability to accept instructions and incorporating feedback into future applications. Despite training and supervisory guidance, you have not exhibited a level of performance appropriate to your

- grade level, which indicates little potential for growth and development as a career employee at the USPTO.

- Over the entire course of plaintiff's time at the USPTO, no one from the USPTO made any negative comments about plaintiff's age or race.

- During plaintiff's employment as a probationary Patent Examiner, plaintiff complained to the USPTO's Office of Equal Employment Opportunity and Diversity ("OEEOD") that Betit was harassing plaintiff.

- On May 14, 2014, an official from OEEOD spoke to Betit about plaintiff's harassment complaint.

- On May 23, 2014, an official from OEEOD spoke to Garber about plaintiff's harassment complaint.

- Human Resources Specialist Kathryn Griffin investigated plaintiff's allegation that he was subjected to a hostile work environment based on his race, color, national origin, and age. In June and July 2014, Griffin interviewed plaintiff, Garber, Nickerson, and Betit.

- On August 26, 2014, Griffith concluded in an investigation report that plaintiff was not subjected to a hostile work environment in violation of Title VII. Following plaintiff's termination, plaintiff amended his EEO complaint to add a claim that the USPTO discriminated against plaintiff in terminating plaintiff's employment.

- Plaintiff filed a formal complaint with the Equal Employment Opportunity Commission ("EEOC") and requested a hearing before an administrative judge. At the administrative stage, plaintiff and the USPTO engaged in discovery. Plaintiff, by counsel, deposed Betit, Nickerson, and Garber, and the USPTO responded to plaintiff's document requests and interrogatories.

- On May 25, 2016, the administrative judge informed the parties of his intent to grant the USPTO's motion for summary judgment.

- On April 21, 2017, plaintiff withdrew his hearing request and requested issuance of a final agency decision.

- On June 30, 2017, the USPTO issued a decision which determined that plaintiff had not been subjected to a hostile work environment during his employment at the USPTO and that plaintiff's termination did not result from race or age discrimination.

- Plaintiff appealed the USPTO's decision to the EEOC's Office of Federal Operations, which affirmed the USPTO's decision.

- On March 4, 2019, plaintiff filed this suit.

Seeking to avoid summary judgment, Plaintiff relies chiefly on the unsworn testimony of Katrelle Jones-Bouie, a former probationary Patent Examiner in plaintiff's Lab, and the Complaint's allegations. *See* note 2, *supra*. According to Jones-Bouie, both plaintiff and his office-mate had difficulty obtaining Betit's approval for office actions, but plaintiff's office-mate's applications seemed to be returned at a faster rate after plaintiff spoke out about Betit's failure to review his work quickly. Jones-Bouie stated that although she initially did not think plaintiff experienced discrimination based on his race or age, she later thought that plaintiff "loosely" experienced discrimination based on his race or age.

The following allegations appear in plaintiff's Complaint but are not supported by citations to record evidence.

- Betit singled out and treated plaintiff differently than similarly situated Patent Examiners who were younger.

- Specifically, Betit spoke to plaintiff in a rude or inappropriate manner or otherwise treated him differently than James Heffern, a 34-year-old Caucasian male.

- Betit refused to approve plaintiff's work on a particular application, even when Saeed and and Pan had assisted plaintiff on that application. Betit continued to return the same application to plaintiff for edits and prevented plaintiff from seeking supervisory assistance.

- Betit called plaintiff from home in February 2014 and "rudely stated: I don't want you to talk to nobody, do you hear me . . . you have to do your work," and repeated himself until plaintiff agreed.

- On April 4, 2014, Betit interrupted plaintiff's phone conversation to ask with whom plaintiff was speaking. When plaintiff said he was asking someone else for assistance with an application, Betit yelled, in front of others, "I told you not to talk to nobody, and I meant it!"

- Plaintiff did not observe Betit treating others in the same manner, and plaintiff's unidentified office-mate said that he was not treated in the same manner.[3]

---

[3] No affidavit from the unidentified office-mate was submitted.

- On April 29, 2014, Betit and plaintiff met about an application, and plaintiff asked to use Betit's notes from the meeting to make corrections on the application. Betit refused to share the notes, stating "I will not give it to you . . . use the previous one . . . and if you can't do that you don't need to work here."

- On May 14, 2014, Betit said that he would not authorize plaintiff's requested leave for military training without seeing his military orders. During a discussion about this leave, Betit "hit a table with his fist, aggressively yell[ed] at plaintiff, and slammed folders on the table of his office during the meeting with plaintiff."

- Plaintiff completed seven applications while working under Nickerson's supervision, more than the five applications he was assigned to complete.

- Plaintiff met the production goals set by Garber as conditions of plaintiff's continued employment at the USPTO.

- Betit's behavior caused plaintiff to experience stress at work, prevented plaintiff from concentrating at work, and interfered with his ability to sleep.

## II.

The summary judgment standard is too well-settled to warrant extensive discussion. Summary judgment is appropriate when there is "no genuine issue as to any material fact" and based on those undisputed facts the moving party is "entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 322. To avoid summary judgment, the opposing party must set forth specific facts showing a genuine issue for trial that are "material," which means that the disputed fact "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Importantly, at the summary judgment stage, courts must view the evidence in the light most favorable to . . . the non-movant." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).

## III.

Plaintiff claims that he was subjected to a hostile work environment based on his race and age in violation of Title VII and the ADEA. For the reasons set forth below, summary judgment

9

must be granted in favor of defendant on plaintiff's race- and age-based hostile work environment claims.

To avoid summary judgment on his Title VII and ADEA hostile work environment claims, plaintiff must show that a reasonable jury could find that the conduct he alleges was (1) unwelcome; (2) based on his race and/or age; (3) sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive work environment; and (4) imputable to his employer. *Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 495–96 (4th Cir. 2015); *Baqir v. Principi*, 434 F.3d 733, 745–46 & n. 14 (4th Cir. 2006) (assuming, without deciding, that a hostile work environment claim is generally cognizable under the ADEA). In other words, as the Supreme Court has made clear, a hostile work environment exists when an employee's "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Hostile work environment claims "are based on the cumulative effect of individual acts." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).

Here, defendants contend that plaintiff's hostile work environment claims fail because the alleged conduct on which plaintiff relies was (i) not based on plaintiff's race or age and (ii) not sufficiently severe or pervasive. *See Harris*, 510 U.S. at 21. For the reasons that follow, defendants are correct; plaintiff has failed to present evidence that establishes a triable issue of fact as to whether the alleged conduct was based on plaintiff's race or age or was sufficiently severe or pervasive.

It is well-established that harassment must be "because of" plaintiff's status as a member of a protected class to form the basis for a hostile work environment claim. *See Oncale v.*

10

*Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998) ("Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at '*discriminat[ion]* . . . because of . . . sex.'") (emphasis in original). Put another way, a plaintiff must show that "but for" plaintiff's membership in a protected class, plaintiff "would not have been the victim of the alleged discrimination." *Gilliam v. South Carolina Dept. of Juvenile Justice*, 474 F.3d 134, 142 (4th Cir. 2007) (quoting *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998)).

A plaintiff may show an employer's animosity toward a protected class through direct evidence or evidence of differential treatment of similarly situated employees outside of a protected class. *See Causey*, 162 F.3d at 801–02 (affirming district court's grant of summary judgment to employer on hostile work environment claim where plaintiff failed to present evidence of "derogatory comments" or "differential treatment of similarly situated employees" outside of plaintiff's protected class). Here, as plaintiff has conceded, there is no evidence that anyone at the USPTO made a negative comment about plaintiff's race or age. Accordingly, to show that the alleged conduct was based on plaintiff's race or age, plaintiff must show specific evidence of differential treatment of similarly situated employees who are younger or of a different race than plaintiff. *See Gilliam*, 474 F.3d at 142–43 (citing *Causey*, 162 F.3d at 801–02). Importantly, a plaintiff may not avoid summary judgment on a hostile work environment claim by pointing to "general statements" regarding differential treatment. *Id.*

Plaintiff has not presented specific evidence to show that any of the alleged conduct was based on plaintiff's race or age. Here, the Complaint's unsworn allegations merely state in a conclusory fashion that Betit's treatment of other patent examiners, including Heffern, a younger, white probationary Patent Examiner, differed from Betit's treatment of plaintiff without providing any further detail. Where, as here, a plaintiff's claim of differential treatment rests on "conclusory

11

statements" not supported by record evidence, a plaintiff cannot sustain "an actionable claim for harassment." *See Causey*, 162 F.3d at 801–02.

Nor does Jones-Bouie's testimony create a triable issue of fact as to whether the alleged conduct was based on race or age. Jones-Bouie's perception that plaintiff "loosely" experienced discrimination and that plaintiff's office-mate's applications seemed to be returned at a faster rate after plaintiff protested Betit's review method are no more than the type of "general statements" that cannot serve as a bar to summary judgment on a hostile work environment claim. *See Gilliam*, 474 F.3d at 142–43 (affirming award of summary judgment to employer where plaintiff's evidence of dissimilar treatment consisted of general statements by plaintiff and other witnesses) (citing *Causey*, 162 F.3d at 801–02).[4]

The Fourth Circuit held that witness statements similar to Jones-Bouie's testimony regarding differential treatment failed to create a triable issue of fact as to whether alleged harassing conduct was based on race in *Gilliam v. South Carolina Department of Juvenile Justice*, 474 F.3d 134 (4th Cir. 2007). There, the Fourth Circuit concluded that the plaintiff, an African-American nurse, failed to show that the alleged conduct was based on her race where the plaintiff and two other employee witnesses testified that she was treated differently than white nurses when she was reprimanded for tardiness, criticized for her work quality, questioned in an unfriendly manner in front of others, and told to stop laughing loudly in a hallway. *Id.* at 135–37. In granting summary judgment to the employer, the Fourth Circuit observed that "[a]lthough [plaintiff] made several general statements of dissimilar treatment, [plaintiff] provided very few specifics" and that those general statements did not bar entry of summary judgment in defendant's favor. *Id.* at 142.

---

[4] As noted, plaintiff was given leave to depose Jones-Bouie prior to this motion's resolution but chose not to do so. Plaintiff also chose not to depose Heffern despite being given an opportunity to do so.

12

The same result obtains here for the same reasons. Plaintiff has presented no specific evidence beyond his allegations that he was treated differently than other Patent Examiners and Jones-Bouie's testimony that plaintiff "loosely" experienced discrimination and that his work was reviewed more slowly than an office-mate's work. Where, as here, a plaintiff's claim that harassment was based on protected status depends solely on plaintiff's "general statements" without evidentiary support, those statements "are insufficient to sustain an actionable Title VII claim." *Id.* at 143 (citing *Causey*, 162 F.3d 801–02).[5]

To be sure, specific evidence in the record shows that Betit expressed frustration with plaintiff's poor performance and that other senior patent examiners also considered plaintiff's performance unsatisfactory. Absent direct evidence of discriminatory animosity or specific evidence of discriminatory differential treatment, plaintiff cannot sustain a claim for hostile work environment merely by showing that Betit "harbored some personal dislike of [plaintiff] that made [plaintiff's] job more difficult or stressful." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281 (4th Cir. 2000) (affirming district court's grant of summary judgment to employer on hostile work environment claim where plaintiff failed to "show that these problems were racial in nature").

Even assuming *arguendo* that plaintiff could show that the meager alleged conduct was based on his race or age, plaintiff cannot avoid summary judgment on his hostile work environment claim for another reason, namely that the alleged conduct fails to satisfy the severe or pervasive conduct requirement. *See Harris*, 510 U.S. at 21. The Fourth Circuit has instructed courts evaluating hostile work environment claims to consider the "totality of the circumstances,

---

[5] Moreover, plaintiff has not disputed record evidence indicating that, although Heffern described Betit's review of Heffern's work as "excessive" and "very taxing," Heffern was performing better than plaintiff. Thus, any causal link between plaintiff's race or age and his treatment compared to Heffern is weakened by evidence that Heffern was not similarly situated to plaintiff with respect to professional performance.

13

including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Okoli v. City of Balt.*, 648 F.3d 216, 222 (4th Cir. 2011). The "severe or pervasive" conduct element "has both a subjective and an objective component." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 208 (4th Cir. 2019) (quoting *E.E.O.C. v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009)). That is, to satisfy the severe or pervasive conduct requirement, plaintiff must present evidence that that plaintiff "did perceive, and a reasonable person would perceive, the environment to be abusive or hostile." *Id.* As the Fourth Circuit has made clear, the objective severe or pervasive conduct test is "a high bar," and "rude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor are not actionable under Title VII." *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315–16 (4th Cir. 2008).

These principles applied here point persuasively to the conclusion that plaintiff has not identified a triable issue of fact as to whether the alleged conduct was severe or pervasive. To begin with, plaintiff's disagreement with Betit's rejection of plaintiff's work, Betit's revisions, and Betit's methods of providing feedback represent a routine difference of opinion and personality conflict with a supervisor that does not amount to a hostile work environment. *See Hawkins*, 203 F.3d at 282 (observing that employers routinely require employees to work late and redo documents). As plaintiff acknowledged, the review procedure for plaintiff's work was within Betit's discretion, and a reasonable person would not perceive Betit's expression of dissatisfaction with plaintiff's work as harassment.

Nor did Betit's instructions in an alleged February 2014 phone call and an April 2014 in-person interaction that plaintiff must not to talk to others about plaintiff's work constitute severe

14

harassment. When Betit thought that plaintiff had violated Betit's instructions not to speak with persons outside of the USPTO about confidential information in patent applications, Betit again instructed plaintiff not to speak with unauthorized persons about patent applications. After plaintiff informed Betit that plaintiff was discussing an application with a USPTO Information Technology Resource Provider, Betit clarified that speaking with an Information Technology Resource Provider was permitted and reaffirmed that plaintiff should not speak to a "friend" outside of the USPTO about any applications. Betit's insistence that plaintiff abide by the USPTO's confidentiality practices is far from the type of severe or pervasive conduct required to sustain a hostile work environment claim. *See Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (affirming dismissal of hostile work environment claim where plaintiff's reassignment resulted in dispute about plaintiff's duties). Similarly, Betit's refusal to provide plaintiff with notes from their conversation and statement to plaintiff that if he did not like that "[he didn't] need to work here" may have offended plaintiff, but that statement did not create an abusive environment. *See id.*

Finally, plaintiff's claim that Betit "hit a table with his fist, aggressively yell[ed] at plaintiff, and slammed folders on the table of his office" during a conversation where Betit refused to authorize plaintiff's requested leave for military training without seeing his military orders does not clear the severe or pervasive conduct test's "high bar." *Sunbelt Rentals, Inc.*, 521 F.3d at 315–16. Plaintiff's unsupported allegations regarding Betit's conduct during this meeting are similar to allegations that the Fourth Circuit held were not sufficiently severe or pervasive to support a hostile work environment claim in *Buchhagen v. ICF International, Inc.*, 545 F. App'x 217 (4th Cir. 2013). There, the Fourth Circuit held that the plaintiff's allegations in that case fell "far short of being severe or pervasive" where the plaintiff there alleged that supervisor yelled at plaintiff in a

15

meeting, yelled and pounded her hands on a desk during another meeting, and repeatedly criticized and ridiculed plaintiff's work performance and use of leave. *Id.* at 219 (affirming dismissal of age-based hostile work environment claim). Here, too, Betit's alleged yelling, fist-pounding, and paper-slamming during the meeting regarding plaintiff's military orders does not constitute severe or pervasive conduct. *See id.* In sum, consideration of plaintiff's evidence in its totality makes clear that the alleged conduct was not severe or pervasive, and thus the alleged conduct cannot support a hostile work environment claim.

Seeking to avoid this result, plaintiff argues that Betit's conduct meets the severe or pervasive standard because it interfered with plaintiff's work performance. Plaintiff's argument in this regard only addresses the "severe or pervasive" standard's subjective prong and does not alter the result that plaintiff has failed to present specific evidence that would lead a reasonable person to perceive plaintiff's work environment as abusive. *See Perkins*, 936 F.3d at 209 ("Those incidents, while no doubt serious to [plaintiff,] from an objective perspective cannot reasonably be described as either frequent, physically threatening or humiliating.").

In sum, plaintiff has failed to identify a triable issue of fact regarding whether he was subjected to a hostile work environment based on race or age and whether the alleged conduct was severe or pervasive. Accordingly, summary judgment must be granted in defendant's favor on plaintiff's race- and age-based hostile work environment claims.

### IV.

Plaintiff alleges that he was terminated because of his race and age in violation of Title VII and the ADEA. For the reasons that follow, summary judgment must be granted in favor of defendant on plaintiff's race- and age-based discriminatory termination claims.

As noted, because plaintiff offers no direct evidence of race or age discrimination by the person who made the decision to terminate plaintiff or any other person at the USPTO,[6] plaintiff's claims are analyzed under the *McDonnell-Douglas* burden shifting framework. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). Plaintiff must first establish a *prima facie* case of disparate treatment based on race or age. To do so, a plaintiff must show (1) that he is a member of a protected class; (2) that he suffered adverse employment action; (3) that he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) that the position remained open or was filled by similarly qualified applicants outside the protected class. *Id.* at 802; *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 513 (4th Cir. 2006) (applying the same requirements to age discrimination claims). In the event a plaintiff establishes a *prima facie* case, defendant may rebut that case by articulating a legitimate, non-discriminatory justification for the adverse personnel action. *See Warch*, 435 F.3d at 513–14. To overcome a defendant's legitimate, nondiscriminatory justification, a plaintiff must establish that the defendant's "proffered reason was mere pretext." *Hawkins*, 203 F.3d at 278.

Where, as here, the undisputed record evidence indicates that plaintiff was not meeting his employer's expectations at the time of his termination, a plaintiff fails to establish a *prima facie* case of discrimination. *See Warch*, 435 F.3d at 517–18 (holding that employee who was repeatedly reprimanded for performance and instructed on how to improve was not meeting employer's legitimate performance expectations). Importantly, the record reflects that SPE Betit was not alone in observing that plaintiff's performance was unsatisfactory and did not improve over time. SPE

---

[6] Direct evidence is "evidence of conduct or statements that both reflect directly on the alleged discriminatory attitude and that bear directly on the contested employment decision." *Johnson v. Mechs. & Farmers Bank*, 309 F. App'x. 675, 681 (4th Cir. 2009) (quoting *Taylor v. Va. Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (*en banc*)). As noted, it is undisputed that over the entire course of plaintiff's employment at the USPTO, no one from the USPTO made any negative comments about plaintiff's age or race.

Saeed, who supervised plaintiff's work while Betit was on leave, stated that plaintiff had difficulty searching for prior art and incorporating Saeed's recommendations into his work product. Morrison, a primary patent examiner who helped plaintiff with an application, stated that plaintiff needed to improve his searches to succeed. SPE Nickerson, plaintiff's supervisor during his trial period as a network patent examiner, observed that plaintiff's work quality and progress was lower than expected, that plaintiff had difficulty articulating concepts, and that plaintiff occasionally made statements that indicated he had not read the application at issue. Nickerson did not recommend a transfer based on plaintiff's trial period performance. Finally, Garber, plaintiff's second line supervisor, observed that plaintiff's quality of work was low and that he was not progressing in the manner expected of a probationary patent examiner of his experience. In sum, the record makes unmistakably clear that plaintiff was not satisfying his employer's legitimate expectations. Plaintiff has failed to establish a *prima facie* case of race- or age-based discriminatory termination, and thus defendant is entitled to summary judgment.

Even assuming *arguendo* that plaintiff had established a *prima facie* case of discrimination, plaintiff failed to show that plaintiff's legitimate, non-discriminatory reason for his termination, his failure to meet the production goals set for him as a condition of continued employment, was mere pretext. When Garber tasked plaintiff with completing a certain number of cases per pay period as a condition of remaining a USPTO employee, plaintiff failed to meet those production goals. Specifically, plaintiff failed to obtain approval of two new office actions during his 23rd pay period. Moreover, plaintiff failed to obtain as required approval of two new office actions during his 24th pay period, during which time plaintiff submitted only one new office action for review. In short, plaintiff has presented no evidence to suggest that his termination was mere

pretext for a discriminatory motive; it was clearly based on his failure to meet incremental production goals.[7]

Plaintiff's only effort to challenge this rationale as pretextual appears in the Complaint, which contends that plaintiff completed the requisite number of applications to meet Garber's production goals. But this conclusory allegation misstates defendant's criteria for plaintiff's continued employment, namely that plaintiff must obtain *approval* of the office actions assigned during each pay period. Moreover, plaintiff's perception that he met production goals does not show that defendant's rationale for terminating plaintiff was pretextual. As the Fourth Circuit has repeatedly made clear, when evaluating an employee's satisfaction of an employer's legitimate expectations, "it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Hawkins*, 203 F.3d at 280 (quoting *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)).[8] Here, plaintiff failed to obtain approval for the required number of office actions in pay periods 23 and 24, and plaintiff has not presented any evidence to suggest that this rationale is mere pretext for discrimination.[9]

---

[7] Moreover, plaintiff failed to meet other production goals set for him during his employment as a probationary Patent Examiner. During his trial period under Nickerson's supervision, plaintiff failed to complete the networking cases he was assigned to submit and obtain approval for during the trial period. With respect to plaintiff's overall performance, plaintiff's production rate as a probationary Patent Examiner, 23 percent, was far below the level at which non-probationary Patent Examiners are expected to perform to be considered successful, 95 percent.

[8] Similarly, plaintiff's coworkers' assessments of plaintiff's performance are also "close to irrelevant." *Hawkins*, 203 F.3d at 280 (quoting *DeJarnette*, 133 F.3d at 299). Accordingly, Katrelle Jones-Bouie's testimony that plaintiff had an easier time obtaining approval for his office actions when he submitted them to supervisors other than Betit is irrelevant to whether plaintiff was meeting the incremental approval requirements set by Garber, the ultimate decision maker with respect to plaintiff's termination. *See id.*

[9] It is worth noting that plaintiff provided no response to defendant's arguments in its summary judgment motion regarding plaintiff's discriminatory termination claim based on race and age. In such circumstances, "many courts within the Fourth Circuit, as well as other circuits, have held that a plaintiff's failure to respond to a summary judgment motion constitutes waiver or abandonment of a claim." *Orbit Corp. v. FedEx Ground Package Sys., Inc.*, 2016 WL 6609184, at *15 (E.D. Va. Nov. 8, 2016) (collecting district court cases). Here, defendant is entitled to summary judgment on plaintiff's discriminatory termination claim as a matter of law based on the merits, but plaintiff has also abandoned his claim by not responding to defendant's motion for summary judgment with respect to this claim.

For these reasons, summary judgment must be entered in favor of defendant on plaintiff's race- and age-based discriminatory termination claims.

V.

For the reasons set forth above, defendant's motion for summary judgment will be granted.

An appropriate Order will issue separately.

The Clerk is directed to provide a copy of this Memorandum Opinion to all counsel of record.

Alexandria, Virginia
February 19, 2020

/s/
T. S. Ellis, III
United States District Judge